## Irwin Estate

*Wisler, Pearlstine & Talone,* for accountant.

*Fox & Differ, William J. Moran, Jr.,* and *Knox Henderson,* for claimants.

TAXIS, P. J., March 22, 1960.—Ada Irwin, decedent, died June 29, 1959, leaving a will dated July 14, 1953, in which Peoples National Bank was named as executor. Item five of the will provides:

"I give, devise and bequeath my real estate, situate in Bridgeport, Montgomery County, Pennsylvania, to my son, Joseph Irwin."

The will contained no residuary clause.

Decedent was survived by a son, Joseph G. Irwin, the specific devisee named in item five of the will, but Joseph subsequently died on October 1, 1959, and Ellabell S. Irwin, his widow, was duly appointed executrix of his estate. As executrix, she appeared at audit claiming the entire balance for distribution under item five of the will quoted above. Another son, George Irwin, predeceased testatrix, leaving issue, George M. Irwin. Another son, John Robert Irwin, also predeceased testatrix, leaving issue, namely, Dorothy Campbell, Mary Elizabeth Hellyer, John P. Irwin and G. Robert Irwin.

On December 22, 1958, Ada Irwin had been declared an incompetent by this court, and on the same date, Montgomery County Bank and Trust Company was appointed guardian of her estate. At the time of the guardian's appointment, the main asset of this incompetent's estate consisted of her residence real estate situate at 105-07 West Fourth Street, Bridgeport, which was subject to a mortgage of $5,000. There were no funds available for the maintenance and support of the ward and, as a consequence thereof, the guardian, on January 23, 1959, petitioned this court seeking leave to sell the real estate pursuant to section 443 of the Incompetents Estates Act of 1955, in order to create a fund for maintenance and support of its

ward. In that petition the guardian averred that it had prospective purchasers willing to pay $17,000.

The court directed the guardian to advertise said proposed sale for three successive weeks. On February 28, 1959, the date set for hearing on the petition to sell, a higher offer was submitted, and after an auction in the courtroom, a higher offer of $18,700 was submitted by Alex Fiorillo and his wife. This offer was approved by the court and the guardian directed to enter into an agreement with these purchasers. On March 2, 1959, an agreement of sale was executed by the guardian and the Fiorillos and the down money paid to the guardian. On June 29, 1959, before settlement was completed under this agreement of sale, the incompetent died, without regaining her competency. Her will was duly probated and the Peoples National Bank of Norristown qualified as executor. The guardian of the incompetent's estate subsequently filed its account of the funds in its hands, the down money, and the balance, after payment of necessary administration expenses, was awarded to the executor on September 22, 1959. On July 2, 1959, three days after testatrix's death, the executor completed settlement under this agreement of sale. The proceeds of the sale of that real estate comprise the major portion of the estate now accounted for by the executor. Subsequent to the audit, counsel for Ellabell Irwin, executrix of the estate of Joseph G. Irwin, by exchange of letters, admit that the estate of Joseph G. Irwin is indebted to Beneficial Finance Company in the amount of $570.04 on a judgment duly entered, and that any award to the estate of Joseph G. Irwin is subject to this claim.

Since decedent's will contained no residuary clause, if this court should decide that the guardian's agreement of sale adeemed all this specific devise of real estate, then the proceeds of sale constitute personal

property which would devolve to testatrix's next of kin under the intestate laws. Contrarily, if the court should conclude that the agreement of sale only worked a conversion or ademption pro tanto, then the proceeds of sale would retain their character as real property and should be awarded under the specific devise of paragraph five of the will, subject to any proper attachments by creditors of Joseph G. Irwin.

Ademption is difficult to accurately define, but denotes generally the loss or destruction of a specific legacy or devise by reason of the alienation, destruction, loss or consumption of the subject matter of the legacy or devise whereby the specific item given does not exist at the time of testator's death. The doctrine of ademption is based upon the rule that a will is not effective until death and, therefore, if the subject matter of a specific devise or legacy does not then exist but is disposed of, the will cannot be effective with respect to it and the legacy or devise is thereby adeemed. Almost all of the cases dealing with ademption are, quite understandably, cases wherein testator in his lifetime himself disposed of the items specifically given. There is no uncertainty in the cases where testator is the active party.

Much more difficulty, however, is present where the guardian and not testator, in order to create a fund for the ward's maintenance and support, sells the subject matter of an item specifically devised or bequeathed by the incompetent's will, where, as here, testator's incompetency continued until his death. There is no evidence on this record that the ward had lucid intervals during which she may have written a later will. Cf. Koslosky Estate, 2 Fiduc. Rep. 570, at 581. Moreover, the amount realized from the sale proved to be in excess of the ward's lifetime needs and requirements.

Further difficulty is added to the problem by rea-

son of uncertainty and conflict in the Pennsylvania authorities.

In Lloyd v. Hart, 2 Pa. 473 (1846), a lunatic's real estate had been sold by his committee to raise funds for the ward's maintenance. In holding that the sale under a decree of court worked an ademption pro tanto but did not work a conversion of the surplus, Chief Justice Gibson said (p. 478):

"Adverting, then, to what we may suppose would have been done had it been presented to the legislature for special provision, we cannot think that *power to convert beyond the exigencies of the occasion* would have been conferred, since, had it not been for those exigencies, the legislature would have conferred no power at all. The power was to be exercised, not for the sake of conversion merely, but for a purpose beyond it; *and beyond the accomplishment of such a purpose it is not to be supported.* This interpretation of our statute coincides with the interpretation put upon wills, directing lands to be sold for a special purpose, which raise a resulting trust, for the heir, of the unexpended surplus in *Emblyn v. Freeman*, Prec. in Ch. 541; and *Roper v. Radcliff*, 10 Mod. 230; S. C., 9 Mod. 167, 181, on the ground that the devisor intended that his land should be no further converted than the end should require. In *Hill v. Cock*, 1 V. & B. 173, when the purpose of the conversion was disappointed, the whole produce of it was treated as land; and in *Leigh & Dal*, ch. 5, a multitude of cases to the same effect are collected. From these it appears that the equitable character of the property, when legally converted, depends on the will of the devisor, collected from the purpose to be answered by it; but the committee had, in this instance, no will to exercise, or power to convert, as a devisor has, for motives of mere caprice, or for any motive at all not authorized by the statute. The sale was for maintenance of the lunatic

and payment of his debts; consequently what remained when that was accomplished retained the impress of real estate." (Italics supplied.)

The next case dealing with this problem arose seven years later in Hoke v. Herman, 21 Pa. 301 (1853). In the Hoke case, the court, taking the position that ademption does not depend upon the intention of testator, ruled that a specific bequest of a promissory note to the maker of the note was adeemed to the extent of the amount paid thereon by the maker to the guardian of testator after testator had become insane, although neither the legatee nor the guardian knew of the existence of such bequest at the time the payment was made and endorsed on the note. Consequently, after testator's death, the specific legatee having received from the executor the note bequeathed to him, could not recover from the executor the amount which he had paid to the guardian for application on such note, the specific bequest having been adeemed pro tanto by such payment. The following lower court cases follow Hoke v. Herman, supra: Woodward's Estate, 3 D. & C. 433; Graf's Estate, 34 Del. Co. 20; Rourke Estate, 43 Berks 183. Curiously enough none of these cases cite or discuss Lloyd v. Hart, supra, or Buck's Estate, 256 Pa. 359, hereinafter discussed.

The official report of the Hoke case indicates that Lloyd v. Hart was not cited to the court by counsel for the parties nor was any mention made of the Lloyd case by Chief Justice Black. What effect, therefore, did Hoke v. Herman have on Lloyd v. Hart? The uncertainty created was, in my opinion, dispelled by Buck's Estate, 256 Pa. 359 (1917), when Lloyd v Hart, supra, was reaffirmed and relied upon.

In Buck's Estate, 256 Pa. 359 (1917), the court there held that the proceeds of a guardian's sale of the lands of a weak-minded person under the Act of 1907 are to be distributed after the death of the weak-mind-

ed person as realty and not personalty. The court there said, at page 360, as follows:

"The Act of May 28, 1907, P. L. 292 does not provide how the proceeds from the sale of a feeble-minded person's land shall be held, and in this respect is like the Lunacy Act of June 13, 1836, P. L. 589 . . .; and in a case arising after that act (Lloyd v. Hart, 2 Pa. 473) where a lunatic's land had been sold, the same question was raised which is now here presented, and Mr. Chief Justice Gibson, in holding that the sale did not work a conversion said . . . [Here the court quotes from Lloyd v. Hart.]

"Lloyd v. Hart, supra, has never been reversed, distribution was made as thereby directed . . . and in our opinion it rules the case before us. It is true that the Act of 1836 does not, like the Act of 1907, provide for a sale 'where it is for the interest and advantage of the said ward that the same shall be sold,' but limits its application to sales for the payment of a lunatic's debts and for the support and maintenance of himself and his family; but the reasoning applied to sales by virtue of the Act of 1836 applies equally well to sales under the Act of 1907; and this was recognized by the legislature when it provided that a guardian appointed under the Act of 1907 'shall have precisely the same powers, and be subject to the said duties as a committee of lunacy in the State of Pennsylvania,' and by our Supreme Court in construing the former Act of June 25, 1895, P. L. 300, relating to feeble-minded persons, holding in Hoffman's Est., 209 Pa. 357, that that act was in pari materia with the lunacy acts, and should be construed upon the same general lines."

Buck's Estate, supra, was followed in an excellent opinion by Judge Solly, of this county, in Hall Hancock's Estate, 33 Montg. 95. Judge Solly, in ruling that ademption pro tanto occurred, said at page 100:

"The proceeds of the sale were realty in the hands of the Guardian, and are such in the hands of the Administrator c. t. a. The sale of the land did not work a conversion into personalty. Neither the Act of June 19, 1901, nor the Lunacy Act of June 13, 1836, P. L. 589, provides how the proceeds of real estate, sold under the provisions thereof, shall be held, as does the Act of April 18, 1853, P. L. 505, known as the Price Act. But in the case of Lloyd v. Hart, 2 Pa. 473, where the land of a lunatic had been sold under the Act of 1836, it was held that the sale did not work a conversion. The sale was for maintenance of the lunatic and payment of his debts, and 'consequently what remained when that was accomplished retained the impress of real estate,' and was to be distributed as such according to the rules of descent. It was so distributed as appears in *Hart's Appeal*, 8 Pa. 32. The Act of 1901 provides for sale of the real estate of the ward where it is for his interest and advantage. The Act of 1836 does not so provide. But the Supreme Court in *Hoffman's Estate*, 209 Pa. 357, construing the Act of June 25, 1895, P. L. 300, which the Act of 1901 supplements, held that it was in *pari materia* with the Lunacy Acts, and should receive a construction upon the same general lines. And the Act of 1901 provides that the Guardian 'shall have precisely the same powers and be subject to the same duties as a Committee in the State of Pennsylvania.'

"The same question arose in *Buck's Estate*, 25 Dist. Rep. 367. There the real estate was sold under the Act of May 28, 1907, P. L. 292, the 6th section of which concerning the powers of the guardian and the sale of the ward's real estate, is practically the same as the 2nd section of the Act of 1901, and it was held that the sale did not work a conversion of the surplus remaining after the payment of debts, but was realty and distributable as such after the death of the ward. Judge Gummey in that case well said, 'the importance of

maintaining, so far as possible, the estate of a lunatic or feeble-minded person, in the condition in which it was before the Committee or Guardian was appointed, is evident, not only because to hold otherwise might change the course of descent, but also because the Act of 1907 provides in terms that if the afflicted person shall regain ability to care for his or her property, the Court shall so decree and shall discharge the Guardian 'and thereupon the said person shall be, so far as the care of his or her property or person shall be concerned for the future, the same as if the proceeding against him, or her, had never been taken.'

"If Mrs. Hancock had sold the premises, No. 5159 Girard avenue in her lifetime there would have been an ademption of the devise of them in her will to her son, *Harshaw vs. Harshaw*, 184 Pa. 401, because the subject of the devise was extinguished and ceased to have the specific existence ascribed to it in the will. *Blackstone vs. Blackstone*, 3 Watts, 335. No case has been cited, and my own research has failed to find any just like the one at bar. The real estate here was not sold by the testatrix in her lifetime, but by her guardian under the authority of the Court. The proceeds of the sale are real estate. If the decedent had died intestate, they would be distributed to her heirs at law. The money takes the place of the house. While the house does not exist, the money which represents it, does."

One case need be mentioned. In Bidelman Estate, 360 Pa. 195, Justice Stearne, in a case with unusual facts, ruled that since decedent in her lifetime, through her guardian, had transferred the equitable title to real estate, the testamentary provision, an option to purchase at a given price, with respect thereto became inoperative. Justice Stearne distinguished Buck's Estate, by saying, at page 200:

"There [in Buck's Estate] real estate of an incompetent was sold for the support and maintenance of the

ward. After the death, the unused portion of the fund was regarded and distributed *as if* real estate. In the present case there is no question before us concerning the *distribution* of a fund derived from the sale of real estate. The question is whether, *in the lifetime* of decedent, appellant *and her husband* dealing with the guardian, concluded an enforceable contract."

It is important to note that in the instant case the question *is* one of *distribution*. It would appear, therefore, that where, as here, the problem is one of distribution, Buck's Estate would control, and, in any event, I believe Bidelman's Estate inapposite to the present controversy.

The rationale of Lloyd v. Hart and Buck's Estate that the law neither approves nor gives operative effect to a conversion of an incompetent ward's estate "beyond the exigencies of the occasion," not only reflects the rule in a majority of other jurisdictions (see 51 A. L. R. 2d 770) but is more consonant with equitable considerations. The possibility of ademption may allow a guardian to determine which devisee or legatee he will favor by his choice of property to be disposed of, and those whom testator had particularly favored would lose by the application of the rule that ademption occurs. Some of the pitfalls avoided by this rule are well summarized in 4 Page on Wills, p. 389, sec. 530. It is there stated:

"The results of the rule that sale, collection, and the like by guardian of an incompetent person operates as an ademption have been very unsatisfactory. A guardian who is hostile to one of the beneficiaries may adeem the gift to him by a sale of the property, or by collection of a debt. If he is friendly to one to whom a general gift is made or to whom a general residuary gift is given, he may increase the amount of such gift by converting the property into the form which is given to such beneficiary."

I conclude that Lloyd v. Hart, supra, and Buck's Estate, supra, rule this case, and the balance for distribution, representing the proceeds of sale of real estate, is awarded to Ellabell Irwin, executrix of the estate of Joseph G. Irwin, subject, of course, to the claim of Beneficial Finance Company of Norristown. The jewelry valued at $41 is hereby awarded to Betty Hood . . .

And now, March 22, 1960, this adjudication is confirmed nisi.