## Neal Estate

*S. Knox Harper*, of *Stone and Harper*, for administrator.

FLICK, P. J., October 15, 1963.—This is a case of first impression involving the question of ademption of a testamentary gift of corporate stock, exchanged with court approval by the guardian of the estate of the owner who became incompetent after executing her will, for stock of a corporation which by similar exchanges acquired all the stock of the corporation in which testatrix had owned shares.

The matter comes before the court on the petition of Warren National Bank as administrator, c. t. a. of the estate of Ida Neal, who died November 14, 1961, leaving a will dated April 8, 1955, the sixth paragraph of which reads as follows:

"SIXTH: I give and bequeath to my nephew, Jay Willis Neal all my stock in Floridin Company and in Continental Oil Company."

The petition requests the court to make a determination as to whether there has been an ademption of the aforementioned legacy of the Floridin Company stock, and a final order of distribution of the assets of the estate in the light of such determination. . . .

Counsel for administrator made no argument for or against ademption but later submitted a memorandum citing sections of Corpus Juris Secundum, Hunter, Aker, two issues of Fiduciary Review, Horn's Estate, 317 Pa. 49, and two orphans' court decisions. Admittedly, the precise issue presented has never been decided by any reported case in Pennsylvania. The works referred to and the cases there cited have been studied by the court. As this decision will stand as a precedent, a careful review has been made of the legal principles applicable. The cases which deal with facts akin to those before the court have been considered in order to determine what the law governing the facts of the instant case should be. The pertinent and undisputed facts are as follows:

## The Facts

1. Ida Neal owned 17 shares of stock of Floridin Company, with par value of $100 per share, on April 8, 1955, when she executed her will giving and bequeathing to Jay Willis Neal, "all my stock in Floridin Company. . . ."

2. Ida Neal continued to own said shares and was the owner thereof on January 9, 1957, when the Warren National Bank was appointed guardian of her estate, a proceeding at November term 1956, no. 35, and she was thereafter incompetent to change her will or to sell or exchange her stock.

3. After its appointment, guardian filed an inventory of the property owned by Ida Neal, showing said 17 shares of Floridin stock to have a total value of $1,700.

4. On April 1, 1959, there was an 8 for 1 split of Floridin Company's stock whereby 119 additional shares were received by guardian, thus increasing this asset of Ida Neal's estate from 17 to 136 shares.

5. On May 1, 1959, guardian entered into an agreement with Floridin Company and the Pennsylvania Glass Sand Corp., wherein guardian agreed to exchange the 136 shares of Floridin Company stock of Ida Neal in return for 174.08 shares of Pennsylvania Glass Sand Corp. stock. In this agreement, guardian represented that it was entering into the agreement for the purpose of investment in Pennsylvania Glass Sand Corp. stock and was not entering into said agreement with a view for redistribution or resale of said stock. This agreement was part of a general arrangement whereby all Floridin Company stock was to be acquired by Pennsylvania Glass Sand Corp. in exchange for its stock and, as a result thereof, Floridin Company became a wholly owned subsidiary of Pennsylvania Glass Sand Corp.

6. By a proceeding at November term 1956, no. 55, guardian petitioned for approval of its entering into said contract and its action was approved by court order of June 16, 1959.

7. In fulfillment of the contract, the guardian delivered to Pennsylvania Glass Sand Corp. the 136 shares of Floridin Company stock owned by its ward, Ida Neal, and received in exchange therefore 174.08 shares of Pennsylvania Glass Sand Corp. stock. The fractional interest of .08 shares was sold by guardian.

8. On November 19, 1959, there was a 2 for 1 split of Pennsylvania Glass Sand Corp. stock and 174 additional shares of said stock were issued to Ida Neal, thus increasing the total number of shares of the Pennsylvania Glass Sand Corp. stock owned by Ida Neal and held by her guardian, from 174 shares to 348 shares.

9. There were no further changes in the 348 shares of Pennsylvania Glass Sand Corp. stock and this stock was owned by Ida Neal and held by the guardian of her estate at the time of her death on November 14, 1961.

10. With the other assets of Ida Neal, the 348 shares of Pennsylvania Glass Sand Corp. stock were transferred by guardian to itself as administrator, C. T. A. of her estate, and said shares are shown in its first and final account as part of the balance for distribution, valued at $11,505.75.

11. The other assets for distribution consist of cash, a diamond ring, a $7,000 U. S. Treasury bond, and small amounts of stock in five other corporations. The total value of the assets held for distribution is $20,908.60.

On the foregoing facts the court is asked to determine whether the gift of Ida Neal's Floridin Company stock is adeemed and the Pennsylvania Glass Sand Corp. stock is to be distributed to the residuary legatees, or whether the Pennsylvania Glass Sand Corp. stock is to be distributed to Jay Willis Neal, in lieu of the Floridin Company stock bequeathed to him by the sixth paragraph of the will.

### The Law

The first point for decision is whether the gift in the sixth paragraph of the will is a specific legacy and therefore subject to ademption, or a general legacy.

In McFerren Estate, 365 Pa. 490, the court said, beginning on page 492: "Before considering the various appeals the general principles of law relating to this subject matter must be examined. An *ademption* occurs where a legacy is *specific* and the thing bequeathed is disposed of by testator in his lifetime. There is no ademption, however, where the legacy is *general* . . . A *specific legacy* has been defined as a gift by will of a specific article or part of testator's estate, which is identified and distinguished from all other things of the same kind, and which may be satisfied only by the delivery of the particular thing: Snyder's Estate, 217 Pa. 71, 66 A. 157; Wood's Estate, 267 Pa.

462, 110 A. 90; Lenhart's Estate, 344 Pa. 358, 25 A. 2d 725. A *general legacy* is one without such words of identification. A *specific* legacy is adeemed where the thing bequeathed was not a part of testator's estate, whether because it was sold, exchanged, or converted into another form: Hoke v. Herman, 21 Pa. 301; Pruner's Estate, 222 Pa. 179, 70 A. 1000; Horn's Estate, 317 Pa. 49, 175 A. 414; Wood's Estate, 267 Pa. 462, 110 A. 90; Blair et al., v. Shannon et al., 349 Pa. 550, 37 A. 2d 563. A *general* legacy is not liable to ademption. In case of a general legacy of stocks or bonds, if none are owned by testator at the time of death, the legatee may elect to take the value in cash or have the fiduciary purchase them for him: . . . [Cases cited]."

A legacy is presumed to be general rather than specific but whether it is one or the other depends on the intent of testator, i.e., the meaning of the words used in the will. The rule in Pennsylvania is clear that a testamentary gift of "my stock in the X Company" is a specific and not a general legacy. In Horn's Estate, 317 Pa. 49, 50, the court said: "The 7th paragraph of the will provides 'I will and bequeath to A. W. Clemens. . . . Also my Ohio Fuel Corporation stock' [at the time of the will testator owned 209 shares]. The question is whether that legacy was adeemed.

"The legacy was specific: Crawford's Est., 293 Pa. 570, 574, 143 A. 2d 214". In Crawford's Estate, 293 Pa. 570, the court said, page 574: "The order cannot be sustained. True, courts are inclined to treat legacies as general (Kenaday v. Sinnot, 179 U. S. 606; Wilson's Est., 260 Pa. 407; Hammer's Est., 158 Pa. 632) and will do so even where a fund is specified as the source of payment: Welch's App., 28 Pa. 363. Where, however, testator designates the gift as 'my property' for example, 'my home', 'my diamonds,' 'my watch,' or 'my stock,' the legacy is specific: Blackstone v. Blackstone,

3 W. 335, 339; Ferrick's Est., 241 Pa. 340; Woerner's American Law of Administration, vol. 3, p. 1515; and see Wood's Est. 267 Pa. 462; Mizener's Est., 262 Pa. 62; Balliet's Est., 14 Pa. 451."

Under the foregoing authorities it must be held that Ida Neal's bequest of "all my stock in Floridin Company" is a specific bequest. The bequest is therefore subject to ademption, if: (1) Ida Neal disposed of her Floridin Company stock in her lifetime, which did not happen in this case because she became incompetent and a guardian was appointed to manage her property, even before the 8 to 1 Floridin stock split; or (2) Floridin stock was not a part of her estate because it was sold, exchanged, or converted into another form, which did occur in this case. However, the exchange was not made by Ida Neal. It was made by the guardian of her estate which had complete control over her property under the Incompetents' Estates Act of 1955, Act of February 28, 1956, P. L. 1158, and it remains to be seen whether this fact prevents an ademption, under the law.

As to the stock splits, if the legacy of "all my stock in Floridin Company" is adeemed because all her stock in Floridin Company was exchanged by the guardian of her estate for stock of Pennsylvania Glass Sand Corp., then all of the Pennsylvania Glass Sand Corp. stock owned by Ida Neal at the time of her death must be distributed to the residuary legatees named in her will. If the incompetency of testatrix prevents ademption, then the beneficiary is entitled to the stock received in exchange for the Floridin Company stock, and also the extra shares resulting from the stock splits. The law on this is quite clear from the opinion in Woodward Estate, 407 Pa. 638. In that case testatrix owned 143 shares of American Telephone and Telegraph Company stock when she made her will bequeathing 30 shares to Vera F. Walls and 35 shares to Henry

D. Walls. Two years later she received additional shares by reason of a 3 for 1 stock split. On her death, legatees claimed three times the number of shares given to them in the will and the residuary legatees claimed all shares beyond the number specified in the will. The court said, pages 640 and 641:

"We believe the testatrix's language, meaning and intent are clear. She clearly said at the time she made her will that she wished to give 30 shares to Vera and 35 shares to Henry and she wished her residuary estate to be divided among her five named nephews and nieces. *Two years later*, the A. T. and T. stock was split three-for-one. Testatrix received these additional shares of stock and owned and possessed them *for over a year* before her death but never changed her will. How can we then change it for her? Moreover, Section 14 of the Wills Act of 1947, P. L. 89, 20 PS §180.14, provides:

" 'In the absence of a contrary intent appearing therein, wills shall be construed as to real and personal estate in accordance with the following rules:

" '(1) Wills construed as if executed immediately before death. Every will shall be construed, *with reference to the testator's real and personal estate*, to speak and take effect as if it had been executed immediately before the death of the testator.'

"That language is clear and since we find no contrary intent appearing in the will, the Wills Act refutes the claim of Vera and Henry Walls and supports the claim of the residuary legatees. This was in accord with the prior statutory and decisional law."

The opinion of the Orphans' Court of Chester County in Woodward Estate, 11 Fiduc. Rep. 599, affirmed by the Supreme Court, contained the following, pages 604 and 605:

"We believe the basic principle of law with which we are concerned to be as stated by Dean Evans of the Kentucky College of Law, writing in Volume 88, Uni-

versity of Pennsylvania Law Review, page 671, at 672:

" 'In all cases where the legacies have been held to be specific, the additional number of shares after the split-up occurred also passed to the legatee. . . . If, on the other hand, the legacy is general, then the increased number after a split-up does not pass to the legatee.' "

The foregoing rulings are clear statements of law. If Ida Neal had died before the stock which she owned in Floridin Company, including the shares issued by reason of the 8 for 1 stock split, had been exchanged by the guardian of her estate for stock of Pennsylvania Glass Sand Corp., *all* of her Floridin Company stock would have passed to Jay Willis Neal under the sixth paragraph of her will. There can be no doubt about this, and there can also be no doubt that the Pennsylvania Glass Sand Corp. stock issued because of the 2 for 1 stock split must be distributed to residuary legatees unless an ademption by reason of the exchange of stock is precluded by the fact that testatrix became incompetent prior to said exchange, and the exchange was made by the guardian of her estate.

If Ida Neal had not become incompetent and no guardian had been appointed to manage and control her property, then the exchange of Floridin Company stock for Pennsylvania Glass Sand Corp.. stock would have worked an ademption of the bequest of her Floridin Company stock, and all of the Pennsylvania Glass Sand Corp. stock issued to her would go to the residuary legatees. This is clear from Horn's Estate, 317 Pa. 49, when a bequest of " 'my Ohio Fuel Corporation stock' " (209 shares owned) was held to be a specific legacy and adeemed because the testator exchanged his Ohio Fuel stock for stock of Columbia Gas and Electric Corp., a company organized to take over the combined assets of Ohio Fuel Corp. and a West Virginia corporation. In discussing the law, the court said, page 52:

"In Blackstone v. Blackstone, 3 Watts 335, it appeared that, after a will was made, bank stock, the subject of a bequest, was sold or exchanged for a bond of the purchasers, with the declared intention of keeping the bond for the legatees in place of the bank stock, but the legacy was held adeemed. Gibson, C. J., stated the rule to be (at p. 337) : 'It is certainly now held for clear law that a legacy properly specific, and not merely specific in its nature by being charged on a specific fund, is adeemed, or, to speak more properly, extinguished, by any change of its state or form, effected, not by fraud or operation of law, but by the act of the testator, whatever be its purpose, which makes the corpus of the legacy, at his death, a different thing from what is indicated by the terms of the description.' "

A similar ruling was made this year by the Orphans' Court of Dauphin County in Klinger Estate, 30 D. & C. 2d 292 (1963), where the will gave " 'my business known as K. U. K. Auto Transit' ". Testator and other carriers for Chrysler Corp. were required by Chrysler to combine and they organized a Delaware Corp. in which testator purchased 20,000 shares. This corporation purchased an Illinois corporation and when the Delaware Corp. was dissolved by order of the Interstate Commerce Commission the testator's shares were exchanged for three shares of the Illinois Corp. stock. Testator had retained some tractors and trailers which were sold to the Illinois Corp. on a bailment lease. The court held that the gift of testator's business must be taken to be adeemed except for the balance due at his death on the bailment lease.

In Klinger Estate the court followed Horn's Estate which was fully quoted; also Kepple's Estate, 19 Dist. R. 627, where a bequest of stock in X Railroad Company, later exchanged by testator for stock in Y Railroad Company, was held to be adeemed. Gerlach Estate, 364 Pa. 207, where the court held that a mere

transformation of a sole proprietorship into a corporation with practically all stock owned by testator did not result in an ademption, was distinguished.

The difference between the cases above reviewed and the case to be here decided is that the bequeathed property was exchanged by testator in Horn's Estate, Kepple's Estate, and Klinger Estate, whereas the Floridin Company stock owned by Ida Neal was not exchanged by her but by the guardian of her estate. Does the incompetency of Ida Neal and the consequent appointment of a guardian for her estate, prior to the exchange of her Floridin Company stock for Pennsylvania Glass Sand Corp. stock, contracted for by the guardan with court approval, require a different rule of law; a rule which prevents ademption?

Our courts have said that ademption . . . "results from an inflexible rule of law applied to the mere fact that the thing bequeathed does not exist, and it is not founded on any presumed intention of the testator": Hoke v. Herman, 21 Pa. 301, 305. A hard and fast rule which ignores the property owner's intent can work inequities. A typical example is Blackstone v. Blackstone, supra, where the testator bequeathed " 'all my 250 shares of stock in the Union Bank,' " and he later sold this stock, taking the purchaser's note for the price and declaring his intention that it should go to legatees of the stock. Since he did not change his will, his intent was of no effect; it was held that the gift was adeemed and the note did not pass to legatees.

It must be noted however that our courts have endeavored to avoid the application of the ademption rule by construing the nature and subject matter of legacies, for which testamentary intent is the paramount consideration. Ademption does not apply to general or demonstrative legacies: See Welch's Appeal, 28 Pa. 363; Smith's Appeal, 103 Pa. 559; and the presumption

of testamentary intention is favorable to general legacies; there must be clear proof of restrictive intention to overcome it: Blackstone v. Blackstone, supra. The decisions have been hard to reconcile but the rigors of the ademption rule have been avoided and equitable results obtained by a liberal interpretation of testator's intent in defining what is the subject matter of the gift. If the subject matter is the proceeds of designated property and not the property itself, the legacy is not specific and the gift is not adeemed. See Miller's Estate, 323 Pa. 9, 13: "Intent of testator governs as to the identity or value of the legacy." See also Frost Estate, 354 Pa. 223, reviewed in the July 1946 issue of Fiduciary Review where the inflexible ademption rule is discussed and rulings similar to that in Frost Estate are cited. The review ends with the following statement:

"While ademption is not a matter of intention, Frost Estate shows that the courts will endeavor to construe the nature and subject matter of legacies (where intention is paramount) in such a way as to avoid the application of the ademption doctrine—a policy announced in Blackstone v. Blackstone, 3 Watts 335."

While the foregoing statement is justified by Frost Estate and the other cases cited, those cases are not in point and only serve as a background for the court's ruling in the instant case. When she made her will, Ida Neal owned 17 shares of Floridin Company stock and her bequest of "all my stock in Floridin Company" is clearly a specific bequest. Had there been no exchange, legatee would have been entitled to all the Floridin Company stock owned by her at the time of her death, when the will spoke. See Woodward Estate, 11 Fiduc. Rep. 599, 605. If the ademption rule does not apply in this case it will not be because of the nature and subject matter of the legacy but because a different standard is applied when the testator becomes incompetent, can make no changes in his will, and the sale or exchange

of the thing specifically devised or bequeathed is made by the guardian of his estate.

There is authority for a different standard where real estate of an incompetent is sold by the guardian of his estate. The basic source of this law is the opinion of Mr. Chief Justice Gibson in Lloyd v. Hart, 2 Pa. 473, decided in 1846, never overruled, and followed in 1917, by the Supreme Court in Buck's Estate, 256 Pa. 359, and in 1960, by the Orphans' Court of Montgomery County in Irwin Estate, 23 D. & C. 2d 33. In Lloyd v. Hart the incompetent left no will. His lunacy committee sold his real estate, with court approval, under the Act of June 13, 1836, P. L. 589, "empowering the committee to sell the land for maintenance and payment of debts," page 478. After his death, over one half of the proceeds was shown in the committee's account as unexpended. The question was whether the surplus passed to the lunatic's heirs, as his real property would have passed had it not been sold by his committee, or to his next of kin as personalty. The court held that the committee had limited statutory power and not the general power of conversion that a landowner has, saying, page 479: "The sale was for maintenance of the lunatic and payment of his debts; consequently what remained when that was accomplished retained the impress of real estate."

Money will not be treated as real estate without compelling reasons. The decision in Lloyd v. Hart is based on the distinction between the absolute and complete power which a property owner has to dispose of, encumber or exchange his property, and the limited power given to the committee appointed because the owner has become a lunatic. In holding that a sale of real estate by the committee did not work a conversion, the court held that the Act of 1836 did not give the committee ". . . power to convert beyond the exigencies of the occasion . . . since, had it not been for those

exigencies, the legislature would have conferred no power at all. The power was to be exercised, not for the sake of conversion merely, but for a purpose beyond it; and beyond the accomplishment of such a purpose it is not to be supported . . . the committee had, in this instance, no will to exercise, or power to convert, as a devisor has, for motives of mere caprice, or for any motive at all not authorized by the statute."

In Buck's Estate, supra, the guardian of an incompetent, appointed under the Act of May 28, 1907, P. L. 292, sold real estate owned by his ward. When the incompetent died without recovery from his condition, the guardian filed an account of the proceeds of the real estate sold, and paid over the balance to the executors named in a will made before incompetency. An Orphans' Court decree that the unused balance of the proceeds from the sale of decedent's real estate should be distributed as real estate, was affirmed per curiam on appeal. The court followed the reasoning in Lloyd v. Hart and the rule there laid down, quoting the portion of the opinion which is quoted above. Terminology had changed in 70 years; the committee for the lunatic had become the guardian for a weak-minded person, but the distinction between the power and authority of a property owner and that of the guardian remained the same. This distinction supplies the moral and common-sense basis for the rule of law applied.

In Buck's Estate, pages 361 and 362, the court said: "Lloyd v. Hart, (supra), has never been reversed, distribution was made as thereby directed (see Hart's App., 8 Pa. 32), and in our opinion it rules the case before us. It is true that the Act of 1836 does not, like the Act of 1907, provide for a sale 'where it is for the interest and advantage of the said ward that the same shall be sold,' but limits its application to sales for the payment of a lunatic's debts and for the support and maintenance of himself and his family; but the reason-

ing applied to sales by virtue of the Act of 1836 applies equally well to sales under the Act of 1907; and this was recognized by the legislature when it provided that a guardian appointed under the Act of 1907 'shall have precisely the same powers, and be subject to the same duties as a committee of lunacy in the State of Pennsylvania,' and by our Supreme Court in construing the former Act of June 25, 1895, P. L. 300, relating to feeble-minded persons, holding in Hoffman's Est., 209 Pa. 357, that that act was in pari materia with the lunacy acts, and should be construed upon the same general lines.

". . . and the importance of maintaining, so far as possible, the estate of a lunatic or feeble-minded person in the condition in which it was before the committee or guardian was appointed is evident, not only because to hold otherwise might change the course of descent, but also because the Act of 1907 provides in terms that if the afflicted person shall regain ability to care for his or her own property the court shall so decree and shall discharge the guardian 'and thereupon the said person shall be, so far as the care of his or her property or person shall be concerned for the future, the same as if the proceedings against him or her had never been taken."

The current case is Irwin Estate, supra, decided in 1960. Decedent made a will in 1953. One of the provisions was a devise of her real estate to her son Joseph Irwin, who survived her by a few months. In 1956, testatrix had been declared incompetent and a bank was appointed guardian of her estate, under the Incompetents' Estates Act of 1955, as amended, 50 PS §3101. Her residence was her chief asset and as the guardian had no funds for her maintenance, it sold the property with court approval and executed an agreement of sale. A few months later testatrix died. Her will was probated and executor carried out the

agreement made by the guardian, completed the sale and received the proceeds, which comprised the major portion of the estate. The question presented to the orphans' court was stated in the opinion by President Judge Taxis as follows:

"Since decedent's will contained no residuary clause, if this court should decide that the guardian's agreement of sale adeemed all this specific devise of real estate, then proceeds of sale constitute personal property which would devolve to testatrix's next of kin under the intestate laws. Contrarily, if the court should conclude that the agreement of sale only worked a conversion or ademption pro tanto, then the proceeds of sale would retain their character as real property and should be awarded under the specific devise of paragraph five of the will, subject to any proper attachments by creditors of Joseph G. Irwin."

The holding in Irwin Estate is stated as follows, page 43:

"I conclude that Lloyd v. Hart, supra, and Buck's Estate, supra, rule this case, and the balance for distribution, representing the proceeds of sale of real estate, is awarded to Ellabell Irwin, executrix of the estate of Joseph C. Irwin, . . ." This opinion contains a clear statement of the ademption rule in Pennsylvania and the cases dealing with a sale by guardian. Lloyd v. Hart and Buck's Estate are quoted at length. Hoke v. Herman, 21 Pa. 301 (1853) is distinguished and likewise Bidelman Estate, 360 Pa. 195, in which a guardian's contract to sell was enforced over a bequest of the right to buy. Concerning this case Irwin's Estate, page 42, says: "It is important to note that in the instant case the question *is* one of *distribution*. It would appear, therefore, that where, as here, the problem is one of distribution, Buck's Estate would control, and, in any event, I believe Bidelman's Estate inapposite to the present controversy."

In the instant case the question is also one of distribution, and the following quotation from Irwin Estate, page 42, applies:

"The rationale of Lloyd v. Hart and Buck's Estate that the law neither approves nor gives operative effect to a conversion of an incompetent ward's estate 'beyond the exigencies of the occasion,' not only reflects the rule in a majority of other jurisdictions (see 51 A.L.R.2d 770) but is more consonant with equitable considerations. The possibility of ademption may allow a guardian to determine which devisee or legatee he will favor by his choice of property to be disposed of, and those whom testator had particularly favored would lose by the application of the rule that ademption occurs. Some of the pitfalls avoided by this rule are well summarized in 4 Page on Wills, p. 389, sec. 530. It is there stated:

" 'The results of the rule that sale, collection, and the like by guardian of an incompetent person operates as an ademption have been very unsatisfactory. A guardian who is hostile to one of the beneficiaries may adeem the gift to him by a sale of the property, or by collection of a debt. If he is friendly to one to whom a general gift is made or to whom a general residuary gift is given, he may increase the amount of such gift by converting the property into the form which is given to such beneficiary.' "

Irwin Estate, and the earlier cases on which it is based, were reviewed in Fiduciary Review for May 1960. The article says "it is obvious that rules not applicable to wills of competent testators were applied in finding that what was given existed in part at death." In justification of a different standard in determining what exists at death in estates of persons incompetent at death, it says:

"Obvious reason for a different standard is the inequitable consequences which otherwise might result. For example, a guardian acting from improper motives

and having knowledge of the provisions of the will could deal with assets in such a manner as to increase the shares of those whom he wishes to prefer at the expense of others possibly nearest and dearest to the incompetent: See Graf Est., 34 Del. Co.; cf. Phila. O. C. Rule 142.1(g). Further, while strict rules of ademption are required in normal circumstances for certainty, the harshness of operation is ameliorated by knowledge that the testator, if he so desires, can change his will—an opportunity which infrequently exists for testators declared incompetent. See, however, Crumling Will, 9 Fiduc. Rep. 4; Koslosky Estate, 2 Fiduc. Rep. 570. Cf. Roderick v. Fisher, 97 Ohio App. 95, 122 N. E. 2d 475, annot. 54 Mich. L. R. 156, where one whose adjudged incompetency was solely physical consented to the sale of specifically devised real estate.

"To date the only apparent help that has been given legatees and devisees whose specific gifts have been changed in form during incompetency has been to permit them to receive what remains traceable in another form unexpended in the incompetent testator's estate. Question arises, however, whether the law should go further, preferably by development of case law to give additional protection against unnecessary inequities."

In the court's opinion it is not necessary in deciding this case to go further than the courts have gone in Lloyd v. Hart, Buck's Estate and Irwin Estate. In those cases real estate was converted by the guardian but it cannot be doubted that the same rule applies when personal property is converted. The same reasons justify a different standard when the property given by will is converted by the guardian of an incompetent's estate and not by testator himself. The competent testator is free to change his mind but if he becomes incompetent after making his will, the courts should protect his testamentary scheme from unnecessary disruption.

The Incompetents' Estates Act of 1955, as amended, Act of July 11, 1957, P. L. 794, refers to "the inherent powers and duties of a guardian," and provides that "Whenever the court finds it to be for the best interests of the incompetent, a guardian may, for any purpose of administration or distribution, and on the terms, with the security and after the notice directed by the court: (1) sell at public or private sale, pledge, mortgage, lease or exchange any real or personal property of the incompetent, . . . ": section 443. The guardian of the estate of Ida Neal acted under this authority. In fact, the guardian had no choice. Without a controlling interest in the Floridin Company, guardian had to sell its ward's stock in that Company or join in the agreement to exchange it for Pennsylvania Glass Sand Corp. stock. Under the circumstances the court found the exchange to be for the best interests of Ida Neal for the administration of her estate. Dividends on the stock plus other income were sufficient to maintain her and the shares received in exchange plus the shares received by virtue of the 2 for 1 stock split, were held by the guardian at the time of her death.

By law, the 348 shares of Pennsylvania Glass Sand Corp. stock were owned by Ida Neal at the time of her death. They were held by her guardian in lieu of the 146 shares of Floridin Company stock which would have passed to her nephew under the sixth paragraph of her will if the Floridin Company had not become a wholly-owned subsidiary.

Justice is blind in that it is never swayed by rank or power, but justice is never blind to the facts.

In the court's opinion, the authorities above-quoted and the compelling facts of this case require a finding that the strict rule of ademption, i.e., the gift is void because the thing given has been exchanged for something else, does not apply. The stock received in exchange shall be substituted for the exchanged stock,

specifically bequeathed, and passes to Jay Willis Neal under the sixth paragraph of the will.

For the foregoing reasons the court makes the following

*Order*

And now, October 15, 1963, for the reasons stated in the foregoing opinion, it is hereby ordered that the Warren National Bank, administrator, c. t. a. of the Estate of Ida Neal, deceased, prepare and submit a final decree of distribution pursuant to the foregoing opinion, and the same will be approved and signed by the court.