## HART'S APPEAL.

A lunatic, whose real estate had been sold by order of court, for his maintenance and payment of his debts, died intestate, unmarried, and without issue, father or mother, brother or sister of the whole blood, uncle or aunt, but leaving to survive him, three brothers and a sister of the half-blood, children of his mother by a second marriage, and ten cousins, children of deceased paternal uncles. The half-brothers and sisters were of the blood of the intestate, through his mother, who was a descendant of the paternal great-grandfather of the intestate and his cousins, the common ancestor from whom the intestate remotely derived a part of the estate by descent, devise, or gift, and was also related by blood to the intestate's grandfather, from whom another portion of the estate was remotely derived by devise and descent; the persons last seised thereof, immediately before the intestate, having been his father and a paternal uncle who died intestate. At the time of the death of the intestate, an unexpended balance of the fund made by the sale of his real estate, remained in the hands of his committee: Held, first, that this balance was to be regarded as land for the purposes of distribution; and, second, that the half-brothers and sister were entitled to it in equal portions, in preference to the cousins.

The facts set out in a case stated for the opinion of a court, are not evidence in a subsequent proceeding, nor for any other purpose than that for which they were submitted.

APPEAL by Daniel Hart, John Hart, Jacob Hart, and Catherine Hart, from the decree of the Court of Common Pleas of Lancaster county, in the matter of the distribution of the balance in the hands of Thomas Lloyd, committee of the person and estate of Caleb Evans, deceased, who was a lunatic, amongst his heirs and legal representatives.

*May* 10. In 1833, Caleb Evans was duly found to be a lunatic, and that he had been so for the last fifteen years. In 1839, his committee petitioned the Court of Common Pleas for a sale of his land for the payment of his debts and for his maintenance; which was ordered accordingly, and the land sold. In 1845, the lunatic died unmarried, and without leaving issue, or father or mother, or brother or sister of the whole blood, or uncle or aunt on the father's side; but leaving three brothers, and one sister of the half-blood, the children of his mother Sarah, by a subsequent marriage, and ten cousins, the children of his deceased uncles, William Evans, Nathan Evans, and James Evans, on the side of his father, Caleb Evans, deceased. The final account of his committee, which. was duly confirmed, exhibited a balance of $2,391.23¼, which constituted the balance or fund for distribution. This balance was claimed by the half-brothers and sister of Caleb Evans, the lunatic

and intestate, they being the children of his mother by her second marriage, upon the ground that she was a descendant of Nathan Evans, the elder, from whom they alleged the real estate came; he having been her great-grandfather, as well as the great-grandfather of the ten cousins of the lunatic, on his father's side, who claimed as the nephews and nieces, the next living kindred of Caleb Evans, the father, and of John Evans, the uncle of the intestate, *from* or *through* both of whom the estate was derived in different portions, by devise, descent, or gift, and who were the persons last seised thereof, immediately before the said intestate. Nathan Evans was the common ancestor of both the parties claiming the fund. He died in 1764, leaving three sons, Nathan, James, and John. James Evans died, leaving five sons, viz: William Evans, *Caleb Evans, the father of the intestate*, Nathan Evans, *John Evans*, the uncle, from whom part of the land was derived by the intestate, and James Evans. John Evans died, leaving a daughter, Mary, who married David Edwards, and died, leaving a daughter, Sarah Edwards. Caleb Evans, the son of James, who was one of the sons of Nathan Evans, the elder, married Sarah Edwards, the daughter of Mary Edwards, who was the daughter of John Evans, another of the sons of Nathan Evans, the elder. The said Caleb died, leaving a widow, the said Sarah, and one son, Caleb, the intestate. Sarah, the widow of the said Caleb, and mother of Caleb the intestate, married *David Hart*, by whom she had four children, viz: Daniel Hart, John Hart, Jacob Hart, and Catherine Hart, the appellants. Caleb Evans, the father of Caleb, the intestate, had four brothers, viz:—

1. *William Evans*, who died leaving children, and *five* of whom survived their cousin, Caleb, the intestate, viz: Edmund, James, Barton, William, and Margaret Evans.

2. *Nathan Evans*, who died, leaving children, *three* of whom survived their cousin, the said intestate, viz: Gabriel, David, and Sarah Evans.

3. *John Evans*, who died intestate and unmarried, and without issue.

4. *James Evans*, who died leaving two children, who survived their cousin, the said intestate, viz: Hiram and Rebecca.

The following table exhibits the relationship of the parties:—

Cousins of Intestate.                    The Intestate.    *Half-blood.*

The land, from which the fund for distribution was raised, was derived by the intestate in the manner following:—

The proprietaries of Pennsylvania, by patent, dated December 31, 1733, granted to Nathan Evans, the elder, and common ancestor of both the parties claiming the fund in this case, two hundred acres of land, situated in the then county of Chester, now Lancaster county. On the 20th of May, 1753, Nathan Evans, for and in consideration of ten shillings, and of natural love and affection, conveyed by deed. of grant, bargain, and sale, the one-half part of the said two hundred acres, unto his son, James Evans. On the 21st of May, 1761, the said Nathan Evans made his last will and testament, and died in 1764. By his will he gave to his son Nathan, 5*l.*; to his son John, 100*l.*; and to his son James he devised and bequeathed as follows: " It is to be observed respecting the place whereon I now dwell, that my son James hath made a purchase of the half of it, for which he hath a title." " Lastly, the rest and residue of my real and personal estate, wherever to be found, I bequeath unto my beloved son James Evans, his heirs and assigns for ever." James Evans became thus seised of the entire two hundred acres; and being so seised, the proprietaries, by patent of 22d February, 1765, granted to the said James

Evans, his heirs and assigns, a tract of land adjoining the afore-said tract of two hundred acres, containing eighty-eight acres and six perches; both tracts containing about two hundred and eighty-one acres and allowance. James Evans, by his will dated the 18th of March, 1800, gave to his son James the premises on which the said son then lived, containing one hundred and eight acres; to his son John the premises on which he, John, then lived, containing one hundred and eight acres; and to his son Caleb, the father of Caleb, the lunatic and intestate, the premises whereon the testator then lived, containing sixty-five acres. Each of the tracts thus devised, was composed of the land purchased by as well as devised to James Evans, the testator. He also devised to his son Caleb, the elder, several lots adjoining the said sixty-five acres. Caleb Evans, the elder, being thus seised of eighty-two acres of land, under his father's will, died intestate in 1802, leaving a widow and one son, the intestate, to whom the said land descended. John Evans, one of the sons and devisees of James Evans, died intes-tate, unmarried, and without issue, leaving three brothers, Nathan, William, and James Evans, and a nephew, Caleb Evans, the intes-tate, the only issue of his brother Caleb, who had died before him. The said John Evans was seised, at the time of his death, of one hundred and eight acres of land, devised to him by his father, James Evans, deceased, which, under proceedings in partition, was parted and allotted amongst the brothers and nephew of the de-cedent. The whole real estate which Caleb Evans the intestate became thus seised of, was sold, after he was found a lunatic, by his committee, for his maintenance and payment of his debts.

The foregoing are, in substance, the facts in this case, as re-ported by the auditor.

The auditor reported the balance of the fund for distribution, after deducting expenses of audit, &c., to be $2,215.32¼, but made no distribution.

Whether the fund for distribution was to be distributed amongst the ten cousins of the intestate, who were the next of kin of Caleb Evans, the father of the intestate, and of his uncle, John Evans, deceased, or whether it was to be distributed amongst the half-brothers and sister of the intestate, who, *through* their mother, Sarah Edwards, by her second marriage with Daniel Hart, their grandmother Mary Evans, and their great-grandfather John Evans, were of the blood of Nathan Evans the elder, and common ancestor of both parties claiming the fund, was the question submitted by the auditor, in his report, for the decision of the court below.

The report was re-committed to the auditor, with instructions to make distribution. The auditor thereupon, upon the 22d of Feb., 1847, made distribution of the fund to and amongst the *ten cousins* of the intestate, and filed his report. To this report exceptions were filed by the counsel of the half-brothers and sister.

On the 28th of April, 1847, his Honour, Judge LEWIS, made the following decree: "April 28th, 1847, the parties having been heard by their counsel, and the court being of opinion that the decision of the Supreme Court, in Lloyd *v.* Hart, 2 Barr, 473, upon the case stated for the purpose of determining the right to the money, is binding upon the parties, it is ordered that the report of the auditor be confirmed." From this decree, the brothers and sister of the half-blood, viz: Daniel Hart, John Hart, Jacob Hart, and Catharine Hart, took an appeal to this court.

Errors assigned: 1. The court erred in directing a distribution of the estate of the deceased among his cousins: it should be divided among, and is by law distributable to the brothers and sister of the half-blood of the deceased, being of the blood of the ancestors from whom it came to the intestate.

2. The court erred in deciding that the judgment of the Supreme Court, in 2 Barr, 473, upon the case stated for the purpose of determining the right to the money between the committee and the administrator, is binding upon the parties to this proceeding.

*N. B. Browne*, for appellants.

*Stevens*, contrà.

*May* 15. The opinion of the court was delivered by

BELL, J.—For the purposes of distribution, the fund in court is to be regarded as land (Lloyd *v.* Hart, 2 Barr), and, therefore, the question raised in this appeal is to be treated precisely as though Caleb Evans, the younger, had died seised of the estate, by the sale of which the fund was made.

By the express provision of the sixth section of the act of April 8, 1833, the half-brothers and sisters of the intestate would have taken an estate in fee simple in the land, if not excluded by the operation of the ninth section. This provides "that no person who is not of the blood of the ancestors or other relations from whom any real estate descended or by whom it was given or devised to the intestate, shall in any of the cases before mentioned take any estate of inheritance therein," &c. The counsel of the appellees insists that this proviso looks and is to be limited to a proximate

and *immediate* descent, gift, or devise to the person last seised, and consequently, that in ascertaining the fountain of inheritable blood we cannot go further back than the ancestor or other relation from whom the intestate immediately received the estate. Were this so, it would not set aside the appellants in favour of kindred of the full-blood, for the half-brothers and sister are of the blood of both John Evans, the uncle, and Caleb Evans, sen., the father of the intestate, the last preceding owners, through the common ancestor, Nathan Evans. As is said by Mr. Justice Story, in Gardner *v.* Collins, 2 Peters' S. C. R. 87, a person is, with the most strict propriety of language, affirmed to be of the blood of another, who has any, however small a portion of the same blood derived from a common ancestor. But the rule of descent is not as contended for. Lewis *v.* German, 5 Barr, 165, and the cases therein cited, settles that in order to ascertain who are the "ancestors or other relations" within the meaning of our statute, you must ascend to the first purchaser—to him who brought the estate into the family: for he is the *propositus* from whom the inheritable blood is to be traced. In this instance, a portion of the land sold came by descent, devise, or gift from Nathan Evans, the great-grandfather of Caleb Evans, jun., and a portion from James Evans his uncle, with both of whom, as we have seen, the appellants are connected by ties of blood. They are, therefore, clearly entitled to the money in court in equal proportions.

Nor is there anything in the decree pronounced by this court in Lloyd *v.* Hart, which, as the court below seems to have thought, operates to bar this right. That was a case stated between other parties, for the simple purpose of ascertaining whether the avails of the land was to be treated as real, or personal estate. Having effected that object, the decree made therein is not to be used as an instrument to defeat an interest residing in others not parties to it, a result which was not in the contemplation of any one. Where a case is stated to procure the judgment of a court on certain facts submitted, effect is not to be given to it beyond those facts, and certainly not to compromise a title springing from a different condition of things. It is not even evidence, in a subsequent proceeding, of the facts stated; for circumstances may be conceded as existing to raise a question of law, without intending to admit them as true, and even without believing them. (McLugan *v.* Bovard, 4 W. 313; Darlington *v.* Gray, 5 Wh. 502.) But an examination of the case stated in Lloyd *v.* Hart, will show that the important fact of the relationship of the Harts to the Evans

family was not even hinted at, and therefore it could not have been intended to raise the question presented by this record. It is enough, however, that it was between different parties, and is therefore inconclusive of the present proceeding.

Decree reversed; And it is ordered that the record be remitted into said Court of Common Pleas, with directions to decree a distribution of the fund to David Hart, John Hart, Jacob Hart, and Catherine Hart, the half-brothers and sister of the said intestate, in equal proportions.