[No. 31311. Department Two. November 24, 1950.]

GEORGE HIRT, *Respondent*, v. ANTON ENTUS, *Appellant*.[1]

'Reported in 224 P. (2d) 620.

*Clark W. Adams* (*Theodore B. Bruener*, of counsel), for appellant.

*Poyhonen & Stritmatter* and *Donn F. Lawwill*, for respondent.

ROBINSON, J.—In this action, the plaintiff, George Hirt, claiming ownership of government lots 4 and 7, section 2, township 19 north, range 11 west, W. M., in Grays Harbor county, state of Washington, demanded treble damages for alleged willful trespass by the defendant, Anton Entus, in the cutting of timber thereon. Defendant, the owner of lot 6, and the former owner of lot 5, which are adjacent to

these two lots, admitted the cutting of the timber, but denied plaintiff's claim of ownership and alleged trespass, and asserted that plaintiff was claiming beyond his proper boundaries. Defendant further prayed that the Humptulips river be found and adjudged to be the boundary line between the property of the respective parties. In his reply, the plaintiff joined with the defendant in requesting the court to fix and determine the correct boundary line.

The Humptulips river is a nonnavigable stream which courses irregularly through the area in question. Government surveyors, in 1858, sketched in meander lines purporting to show the then course of the river, designating the property west of such meander lines as lots 4 and 7, and the property east of them as lots 5 and 6. The present location of the river, as determined by the court, is approximately five hundred feet west of the meander lines as drawn by the government surveyors. The sketch on p. 421, while not accurate in detail, will suffice to show the relative positions of the river, the meander lines, and the various lots.

Government lots 4, 5, 6, and 7 became the property of the First National Bank of Hoquiam, and title thereto vested in the Shareholders' Fund, Inc., a holding corporation for the bank. Lots 4 and 7 were conveyed to Hirt by deed, dated March 18, 1939, describing the property as follows:

"Lots numbered One (1), Three (3), Four (4), Seven (7) and Eight (8), less County Road, and the West one-half of the Northeast quarter (W½ of NE¼) and the Northwest quarter of the Southeast quarter (NW ¼ of SE ¼), all in Section Two (2), Township Nineteen (19) North of Range Eleven (11) West of the Willamette Meridian."

Lots 5 and 6 were conveyed to Priscilla Sankus by deed, dated May 2, 1939, describing the property as follows:

"Lots numbered Two (2), Five (5) and Six (6), in Section Two (2), Township Nineteen (19) North of Range Eleven (11) West of the Willamette Meridian, containing fifty-two (52) acres more or less."

Mrs. Sankus was housekeeper for Entus, and admittedly purchased the property in his behalf. She conveyed lots 5 and 6 to Entus by deed, dated June 19, 1939, describing the property in the same manner as indicated above. Lot 5 was later lost to the county for nonpayment of taxes.

Trial was held to the court, which found in favor of Hirt, adjudging him to be the owner of the territory in dispute. Accordingly, the court determined that Entus had cut the timber in question without warrant, and awarded to Hirt treble damages, as claimed in his complaint. The court did not attempt to fix the boundary between lots 4 and 5 because the county of Grays Harbor, which now owns the latter lot, was not a party to the action; but it established the boundary between lots 6 and 7, not along the course of the Humptulips as it presently flows, but along the mid-meander line of the same river as it was surveyed in 1858. From this judgment, defendant, Entus, has appealed.

In analyzing a case of this kind, it is important to take note of several significant general principles.

In the first place, as appellant asserts, it is true that meander lines are not ordinarily regarded as boundary lines, and that, in the usual situation, the watercourse itself will mark the boundary. *Washougal & LaCamas Transp. Co. v. Dalles, Portland & Astoria Nav. Co.*, 27 Wash. 490, 68 Pac. 74. In *Ghione v. State*, 26 Wn. (2d) 635, 652, 175 P. (2d) 955, we said:

"We must, therefore, here consider briefly the force of the government survey meander lines. In surveying fractional portions of public lands bordering upon streams, meander lines are run, not as boundaries of tracts of land, but for the purpose of defining the sinuosities of the banks of the stream, and as a means of ascertaining the quantity of land in the fractions. In the absence of special circumstances not relevant here, the watercourse itself provides the natural boundary. *Railroad Co. v. Schurmeir*, 7 Wall. (74 U. S.) 272, 19 L. Ed. 74; Am. Jur. 766, Boundaries, § 29; 11 C. J. S. 573, Boundaries, § 30b. This court has affirmed that rule. *Rue v. Oregon & Washington R. Co.*, 109 Wash. 436, 186 Pac. 1074; *Harper v. Holston*, 119 Wash. 436, 205 Pac. 1062."

But should the course of the river be changed, the boundary of lots bordering upon the old channel may or may not shift with the river. In the language of *Harper v. Holston*, cited in the quotation immediately preceding:

■ "Another rule is that, when grants of land border on running water, and the course of the stream is changed by that process known as accretion—that is to say, the gradual washing away on the one side and the gradual building up on the other—the owner's boundary changes with the changing course of the stream. . . .

"On the other hand, it is equally the rule that, when a stream which is a boundary, from any cause, suddenly abandons its old channel and creates a new one, or suddenly washes from one of its banks a considerable body of land and deposits it on the opposite bank, the boundary does not change with changed course of the stream, but remains as it was before. This sudden and rapid change is termed in law an avulsion, and differs from an accretion in that the one is violent and visible, while the other is gradual, and perceptible only after a lapse of time." (pp. 441, 442.)

Assuming for the moment that the court was correct in its finding that the river had moved some five hundred feet west from its location at the time of the survey in 1858, it became necessary for it to determine the history of the change. If it was brought about as the result of gradual accretion, the boundaries of the lots moved with the river bed, and lots 5 and 6 were correspondingly enlarged. *Harper v. Holston, supra; Glenn v. Wagner,* 199 Wash. 160, 90 P. (2d) 734; 4 Tiffany, Real Property (3d ed.), 613, § 1219. However, if the change was the result of avulsive action, the boundaries remained as they were formerly located. *Missouri v. Nebraska,* 196 U. S. 23, 49 L. Ed. 372, 25 S. Ct. 155; *Smith v. Miller,* 105 Iowa 688, 70 N. W. 123, affirmed 105 Iowa 693, 75 N. W. 499; *Brown v. Wilson,* 348 Mo. 658, 155 S. W. (2d) 176.

■ The trial court found that the change in the course of the river had been brought about by avulsive action; and we think this finding borne out by the evidence. Appellant's original theory, as set forth in his answer, was that the change was brought about by process of accretion. Even if this were shown to have been the case, appellant's trespass on the alleged accretion to lot 5 would not have been justified, for he had lost title to lot 5 itself through nonpayment of taxes, and, therefore, could on no possible theory be

entitled to any accretion thereto. But the testimony of respondent's expert witness, which was apparently believed by the court, was to the effect that he had made soil boring tests and observations of the age of the trees in the area over which the river was alleged gradually to have shifted; and he testified that, in his opinion, the river could not have flowed over this territory within two hundred years, and that, in all probability, it had not done so for at least five hundred years.

It is possible, of course, that the river never ran in the approximate area marked out by the meander lines, and that, even in 1858, it was flowing close to its present course. This is the theory upon which appellant appears to have come chiefly to rely in the later phases of the case, and it is by no means untenable. In support of this view, appellant cites testimony indicating that old trees were growing in the meander strip. But this does not necessarily indicate that the meander lines did not closely approximate the former course of the river. Meander lines established by government survey are usually a short distance back from the water's edge. They disregard the minor sinuosities of the shore and merely mark the general contour. Patton on Titles, Part 1, ch. 4, p. 247, § 66. On occasion, streams may be found at places entirely without meander lines, and, just as in this case, old stands of timber are sometimes discovered growing within their limits. *Sartori v. Denny-Renton Clay & Coal Co.*, 77 Wash. 166, 137 Pac. 494.

Appellant's position seems to be that, since, as the court put it, it was "generally agreed" that the river might not have been exactly within the meander lines, it must have been where it now is at the time of the government survey. This, of course, suggests that the surveyors made a not inconsiderable error in their establishment of the lines. A perusal of the relevant cases and texts suggests, in fact, that errors of this magnitude, or even much greater ones, were not uncommon, and cases have often arisen in which it has been quite clearly demonstrated that meander lines were run a substantial distance back from the actual water

lines, the area between them in some instances amounting to many more acres of land that are involved here.

The force of the rule that meander lines are not boundary lines, is so strong, however, that, even in such cases, it has generally been held that the owner's rights extend to the water's edge. See, for example, *Anderson v. Trotter*, 213 Cal. 414, 2 P. (2d) 373, and cases there cited; and Patton on Titles, Part 1, ch. 4, p. 251, § 66, where it is said:

"The rule, that the water itself rather than the meander line is the boundary, has been adhered to even in extreme cases, in which the strip between the line and the shore reached an area explainable only by a gross error in the survey."

It is perhaps true that all of the authorities would not be in entire agreement with the extreme position taken by the cases above referred to. Thus, in Clark on Surveying and Boundaries, p. 48, § 58, the author, after recognizing the general rule, states:

"In those cases where the government survey was fraudulently executed or there was a manifest error therein, this rule will not hold but the meander line in such cases may be a boundary line."

Appellant, of course, urges that this case is a proper one for the application of the general rule. In support of his position, he relies chiefly upon the Washington case which admittedly touches most closely upon the problem, *Rue v. Oregon & Washington R. Co.*, 109 Wash. 436, 186 Pac. 1074. But this case is of little assistance because, although it was there held, in a case of alleged conflict between a meander line and the actual course of a river, that the river served as the natural boundary, the decision is largely based upon the fact that the evidence was insufficient to impeach the official government survey and to show that the claimed variance between the river and the meander line actually existed. What the court would have done in a case such as this, where the discrepancy between the two is undisputed, is not clear.

However, it may be conceded that the weight of authority appears to suggest that this discrepancy in itself would be insufficient to justify making an exception to the rule that the actual watercourse, rather than the meander line, will serve as the boundary of government lots. We need not decide the point. For, although, as we have said, it is not inconceivable that the discrepancy arose because of an original error in the survey, we are of the opinion that the evidence preponderates in favor of the trial court's conclusion that it may be explained on the theory that, at some undetermined time after 1858, the river changed its channel by avulsive action. Testimony as to the course of the river in past years was somewhat conflicting, as it usually is in these cases, but respondent's expert witness testified that he had observed distinct signs of an old channel within the meander lines or slightly to the east thereof. On cross-examination, he testified as follows:

"Q. Well, in your opinion, did the water ever run through there between the meander lines? A. Those exact marks there? Q. Well, where you were when Shorey told you where to start? A. Yes, in my opinion, to the east of that marked line there is definite evidence of an old river channel there and a changing channel. Q. About when would you say the river was in there? A. I think, as I testified before, I would judge it would be within the last 100 years. Q. In your opinion was the river ever flowing within the meander lines as marked on Plaintiff's Exhibit 1? A. Approximately within some of those lines, yes, or very close to them."

Tending, to some extent at least, to give added weight to this testimony were the statements of another of appellant's witnesses who was for many years a resident of the area. He testified that, in 1918, the river nearly broke through "practically where that meander line is" and had to be blocked off.

Keeping in mind the principle that an alleged mistake in government surveys must be proven by clear and convincing testimony (*Blair v. Brown*, 17 Wash. 570, 50 Pac. 483), and, on the other hand, being of the opinion that

the evidence fails to show accretion, we must endorse the trial court's conclusions, first, that the river once flowed in the approximate area of the meander lines; second, that, since 1858, it has shifted to the vicinity of its present course; and third, that this shift was caused by avulsion. The essential problem presented by the case, therefore, is not whether the river or the meander lines should be treated as the boundary between the property of the parties, but whether the new channel, or the old channel as now represented by the meander lines, should properly be regarded as serving this function.

As we have noted, where a river shifts its course by avulsive action, boundaries which it previously formed remain unchanged. But appellant contends that this deed from the Shareholders' Fund, Inc., conveyed lots 2, 5, and 6, in section 2, township 19 north, range 11, west W. M., and that, according to the government plat and survey, these lots border on the Humptulips river. Asserting that the government survey was, in effect, incorporated into his deed (*Mitchell v. Smale*, 140 U. S. 406, 35 L. Ed. 442, 11 S. Ct. 819), he argues that this deed carried the lots to the river's edge, no matter where that may be. However, respondent's witness, James C. Sudderth, who had charge of the sale of all of this property for the Shareholders' Fund, testified that, at the time lots 2, 5, and 6 were sold to Mrs. Sankus, she and appellant accompanied him to the north part of lot, 5, and that he indicated to them that lots 5 and 6 extended only as far west as the original government meander lines. To illustrate, he testified that he pointed out to them the location of the lines on Metsker's Atlas of Grays Harbor county (Edition of 1927), which clearly showed these lines as the boundaries between lots 4 and 5, and 6 and 7, respectively, although it also showed the river running west of them in its approximate present location. Appellant denied that this incident took place, but the court apparently did not believe him, and, in evaluating an instance of disputed evidence of this sort, we are not inclined to sub-

stitute our judgment for that of the judge who heard the case.

Appellant contends that the court had no right to admit testimony concerning this alleged incident. His argument appears to be that his deed was the final repository of the agreement between himself and the Shareholders' Fund, and, accordingly, was not subject to modification by parol testimony purporting to establish the intent of the parties at the time it was executed.

■ ■ But parol testimony is always admissible, not to contradict a deed, but to identify the property described in and conveyed by it, and to ascertain to what property the particulars of description contained in it apply. *Newman v. Buzard*, 24 Wash. 225, 64 Pac. 139. For it is the real intention of the parties, to be gathered from the writing, if possible, but, when necessary, by resort to the circumstances surrounding the entire transaction, that must control. *Wisconsin Realty Co. v. Lull*, 177 Wis. 53, 187 N. W. 978.

■ In the instant case, the survey showed the boundary of lots 5 and 6 to be the Humptulips river as it existed in 1858. It is conceivable that an individual, buying lots 5 and 6 under such a deed as was given appellant here, could have been purchasing the property, either with intent to acquire the land as far as the actual present course of the river, or only as far as the river as surveyed in 1858. Parol testimony was admissible to resolve the problem, and disclosing, as it did, an affirmative intention to limit the grant to the old channel as marked by the meander lines, it is this channel which must be considered as the boundary. *Producers Oil Co. v. Hanzen*, 238 U. S. 325, 339, 59 L. Ed. 1330, 35 S. Ct. 755.

■ ■ Having determined that the river had changed its course by avulsion, and that the property in question had been conveyed with reference to the former channel of the river, the court next undertook to locate the proper boundary line between lots 6 and 7. The boundary line of a nonnavigable stream is, in Washington law, the thread of the

stream. *State ex rel. Davis v. Superior Court*, 84 Wash. 252, 146 Pac. 609. However, the exact thread of the former channel could not be determined, and in any event the evidence indicated that the parties had purchased the property with reference to the channel as it had been surveyed. The court, therefore, quite properly selected the mid-meander line of the 1858 survey to serve as the boundary. As Thompson states:

"If the old bed of the river, being gradually deserted by the current, fills up and new land is formed, this belongs to the riparian proprietors on each side, the division line being the thread of the old river; but if the bed of the river, as it existed at the time of the grant, can not be found or traced, the courses and distances of a survey giving the meander line of the river may be resorted to." 6 Thompson on Real Property 663, § 3436.

■ Finally, appellant urges that this case does not warrant the application of treble damages. The relevant statute provides as follows:

"If upon trial of such action it shall appear that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which such trespass was committed was his own, or that of the person in whose service or by whose direction the act was done, or that such tree or timber was taken from uninclosed woodlands, for the purpose of repairing any public highway or bridge upon the land, or adjoining it, judgment shall only be given for single damages." Rem. Rev. Stat., § 940 [P.P.C. § 103-7].

The only clause in this statute which could possibly operate to excuse appellant here is that providing that judgment should only be given for single damages if the trespasser "had probable cause to believe that land on which such trespass was committed was his own." As we have seen, there was evidence that appellant purchased lots 5 and 6 with the understanding that they did not include the disputed territory, and there was further evidence indicating that he was fully apprised that respondent was claiming the area in question. Respondent testified, though

appellant denied, that, in 1941, he informed appellant that he regarded land east of the river as being part of his lots 4 and 7. In any event, appellant admits that respondent told him of this claim in 1949, and the testimony of his daughter indicates that the matter was quite thoroughly discussed between the parties.

In *Mullally v. Parks*, 29 Wn. (2d) 899, 190 P. (2d) 107, this court, after reviewing a number of cases in which alleged trespassers had been subjected to treble damages, stated the general rule to be as follows.

"Where a person has knowledge of a bona fide boundary dispute, and thereafter consciously, deliberately, and intentionally enters upon the disputed area for the purpose of destroying, and does destroy, trees or other property which cannot be replaced, such acts are neither casual nor involuntary, nor can they be justified upon the basis of probable cause for belief by the tort feasor that he owned the land, but, on the contrary, are without lawful authority and will subject such person to treble damages as provided by statute."

Tested by this rule, and always assuming that it was the province of the trial judge to evaluate the controverted testimony, it is plain that appellant's trespass was made under such circumstances as justified the penalty of treble damages. We are of the opinion that the court did not err in imposing it. No complaint is made of the manner in which the damages were computed, and indeed the record indicates that the court took special care to ascertain that appellant should not be unfairly overcharged.

The judgment is affirmed.

SIMPSON, C. J., MALLERY, HILL, and HAMLEY, JJ., concur.